# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DIMARCO LEWIS                                    CIVIL ACTION

versus                                           NO. 09-2848

WARDEN N. BURL CAIN                              SECTION: "N" (3)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Dimarco Lewis, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On February 13, 2003, he was convicted of one count of attempted

armed robbery, two counts of attempted second degree murder, and one count of armed robbery.[1] On April 16, 2003, he was sentenced to forty-nine and one-half years on the attempted armed robbery conviction and fifty years on each of the attempted second degree murder convictions. On that same date, he was also found to be a second offender and was sentenced as such to a term of one hundred ninety-eight years imprisonment on the armed robbery conviction. It was ordered that his sentences be served concurrently and without benefit of probation, parole, or suspension of sentence. Because he used a firearm during the armed robbery and attempted armed robbery, he was sentenced pursuant to La.Rev.Stat.Ann. § 14:64.3 to an additional term of five years imprisonment to be served consecutively to his multiple offender sentence.[2] On June 2, 2004, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's convictions and sentences.[3] The Louisiana Supreme Court then denied his related writ application on November 24, 2004.[4]

On November 16, 2005, petitioner filed with the state district court an application for post-conviction relief.[5] When the court failed to rule on that application, he filed with the Louisiana Fourth Circuit Court of Appeal a "Petition for a Supervisory Writ of Mandamus."[6] The Court of

---

[1] State Rec., Vol. VI of VII, transcript of February 13, 2003, p. 80; State Rec., Vol. II of VII, minute entry dated February 13, 2003.

[2] State Rec., Vol. VI of VII, transcript of April 16, 2003; State Rec., Vol. II of VII, minute entry dated April 16, 2003.

[3] State v. Lewis, 876 So.2d 912 (La. App. 4th Cir. 2004) (No. 2003-KA-1234); State Rec., Vol. VI of VII.

[4] State v. Lewis, 888 So.2d 229 (La. 2004) (No. 2004-KO-1855); State Rec., Vol. VI of VII.

[5] State Rec., Vol. VII of VII.

[6] State Rec., Vol. VII of VII.

Appeal denied relief, holding: "Relator's claims in his application for post-conviction relief have been reviewed. Relator has failed to demonstrate that he is entitled to relief. The request for a writ of mandamus is denied."[7] On January 16, 2009, the Louisiana Supreme Court then denied his related writ application without assigning additional reasons.[8]

On February 13, 2009, petitioner filed the instant federal application for *habeas corpus* relief claiming that he received ineffective assistance of counsel. The state argues that the application is untimely.[9]

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A).[10]

As noted, the Louisiana Supreme Court denied petitioner's writ application on direct review on November 24, 2004. Therefore, under § 2244(d)(1)(A), his convictions became "final" no later than February 22, 2005, when his period expired for seeking a writ of certiorari from the

---

[7] <u>State v. Lewis</u>, No. 2008-K-0146 (La. App. 4th Cir. Mar. 4, 2008) (unpublished); State Rec., Vol. VII of VII.

[8] <u>State *ex rel.* Lewis v. State</u>, 998 So.2d 96 (La. 2009) (No. 2008-KH-0852); State Rec., Vol. VII of VII.

[9] Rec. Doc. 13.

[10] Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

United States Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v.

Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL

1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).  Accordingly, his period

for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless

that deadline was extended through tolling.

      The Court first considers statutory tolling.  The AEDPA provides that the statute of

limitations is tolled for the period of time during which a properly filed application for state post-

conviction relief or other collateral review attacking a conviction or sentence is pending in state

court.  28 U.S.C. § 2244(d)(2).

      After two hundred sixty-six (266) days elapsed, petitioner argues that he tolled the

federal limitations period on November 16, 2005, by filing a post-conviction application with the

state district court.  The state contends that no tolling is warranted because there is no record that

the court received that filing.  This Court rejects the state's contention.

      At this Court's request, the Warden of the Louisiana State Penitentiary submitted

petitioner's prison postal receipt from the date in question.[11]  That receipt shows that petitioner sent

through the prison postal system indigent legal mail addressed to the Orleans Parish District

Attorney and the Clerk of the Orleans Parish Criminal District Court on November 16, 2005.

Petitioner noted on the receipt that the packages contained an application for post-conviction relief.

This Court considers that receipt sufficient support for petitioner's contention that he mailed his

post-conviction application to the state district court on November 16, 2005.  Because the

---

[11] Those records have been filed into this federal record at Rec. Doc. 18.

application was mailed during the continuing chaos in the aftermath of Hurricane Katrina, this Court is not surprised to learn that there is no record of the package having been received by the Orleans Parish Criminal District Court. Moreover, in any event, proof of receipt by the court is not required. The United States Fifth Circuit Court of Appeals has held that, "in Louisiana courts, a *pro se* prisoner's pleading is deemed filed on the date that the prisoner submits the pleading to prison authorities to be mailed, *regardless of whether the pleading actually reaches the court*." Stoot v. Cain, 570 F.3d 669, 672 (5th Cir. 2009) (emphasis added). Therefore, in the instant case, petitioner is entitled to tolling as of November 16, 2005, the date he gave the application to prison officials for mailing. Further, tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought review in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004). Because it is clear that petitioner sought such review in a timely manner,[12] the Court finds that tolling continued until the Louisiana Supreme Court denied relief on January 16, 2009.

At that point, petitioner had ninety-nine (99) days of the federal limitations period remaining. Because he filed his federal application a mere twenty-eight (28) days later on February

---

[12] When he did not receive a ruling on his post-conviction application, petitioner made repeated inquiries regarding its status. When those inquiries likewise went unanswered, he sought relief from the Louisiana Fourth Circuit Court of Appeal by filing a petition for a supervisory writ of mandamus. In response to that petition, the Court of Appeal considered and rejected petitioner's post-conviction claims on the merits. He then timely sought review of that decision by the Louisiana Supreme Court.

The Court notes that the state argues that the timeliness of petitioner's federal application is somehow affected by a denial issued by the state district court on November 8, 2007. That is incorrect. That denial concerned an unrelated motion for production documents, *not* petitioner's post-conviction claims. See State Rec., Vol. I of VII, Judgment dated November 8, 2007. Accordingly, that ruling has no bearing on federal tolling.

13, 2009,[13] the application is timely.  In light of that fact and the state's failure to raise any other procedural defenses, the Court will address the merits of petitioner's claims.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of

---

[13] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner signed his federal application on February 13, 2009.  Accordingly, that is the earliest date he could have presented his application to prison officials for mailing.

> clearly established federal law is objectively unreasonable, and we
> stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an
> unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> This case involves two separate incidents. Both took place on
> the same day, however, and they involved similar crimes. In the first
> incident, the victim of the crimes was Mr. Perrow. In the second
> incident, Mr. Williams was the victim.
>
> **Crimes Against Mr. Perrow**
> Mr. Perrow was jogging in New Orleans early one morning
> along his usual jogging route, and as he turned onto Burgundy Street,
> he saw two young, African American males approaching him on a
> bicycle. One of the males was pedaling the bicycle, and the other
> was riding on its handlebars. Mr. Perrow later identified the two
> males as Mr. [Dimarco] Lewis and Mr. [Lawrence] James.
> Mr. Lewis stopped the bicycle in the middle of the street right
> in front of Mr. Perrow, and both Mr. Lewis and Mr. James jumped
> off of the bicycle. Mr. Lewis confronted Mr. Perrow and asked for
> whatever Mr. Perrow had. Mr. Perrow explained that because he was
> jogging, he was not carrying anything with him. Mr. Lewis then told
> Mr. Perrow to continue running. Mr. Perrow had seen a gun in Mr.
> Lewis' hand, so he began running down Burgundy Street as quickly
> as he could.
> As he ran, Mr. Perrow heard Mr. Lewis yell, "Die, bitch!" A
> shot was fired, and the bullet broke Mr. Perrow's hip. Mr. Perrow

fell onto the street where he had been running, and Mr. Lewis continued to shoot him, causing Mr. Perrow to ask, "Why are you still shooting me?" Mr. Perrow bled profusely after he was shot, and he testified that at that time, he thought he was dying.

Mr. Jeffery Clements, who lived on Burgundy Street, was resting on a couch in his front room when he heard a loud pop that he recognized as a gunshot. He jumped off his couch and put on his jeans which were nearby. While he was putting on his jeans, Mr. Clements heard two more gunshots in quick succession, then after a momentary pause, he heard another shot, and after a second momentary pause, he heard another shot. He heard a total of five gunshots. Mr. Clements' front door was shuttered, and although his door was open, the shutters were not. He unlocked the shutters, threw them open, and saw Mr. Perrow on the ground bleeding. He also saw a young African American male that he later identified as Mr. Lewis tucking something into the waistband of his shorts. He also saw another young African American male, whom he later identified as Mr. James, holding a mountain bike by its handlebars.

As Mr. Clements observed Mr. Lewis turning away from Mr. Perrow, Mr. Lewis looked at Mr. Clements, paused, and then proceeded to get on the bicycle. Mr. James then climbed onto the handlebars of the bicycle, and they rode away from the scene.

As soon as he realized what had happened, Mr. Clements called 911 on his cordless telephone and began administering first aid to Mr. Perrow. The police arrived about five minutes later, and shortly thereafter the emergency medical technicians arrived and began attending to Mr. Perrow.

Another Burgundy Street resident, Antonio Chabera, also witnessed some of the events that morning. He was walking his dog when he saw two young African American men ride past him on his bicycle. They caught his attention, because they appeared to be young, and Mr. Chabera was surprised that they were awake so early on a summer morning. After he saw the two males, who were later identified as Mr. Lewis and Mr. James, he continued walking his dog. He entered an empty lot at the corner of Burgundy Street and Elysian Fields Avenue, and he observed the two men ride down Burgundy Street on the bicycle. Minutes later, he heard five gunshots. He ran into the street and saw the same two men that he had seen minutes before. They were getting on their bicycle. Mr. Chabera ran into a nearby bar to ask someone to call the police, and he then ran to help Mr. Perrow. When he saw that Mr. Clements was assisting Mr.

Perrow, Mr. Chabera ran in the direction traveled by the bicycle.  He saw the bicycle turn down Touro Street toward Claiborne Avenue.

Mr. Perrow, Mr. Clements, and Mr. Chabera all were shown photographic line-ups.  On the day that Mr. Perrow was shot, New Orleans Police Department Officer Jeff Jacob showed two sets of six photographs each to Mr. Clements and Mr. Chabera separately.  Neither was able to identify anyone in the line-up.  Approximately two weeks later, Officer Jacob had become aware of new suspects, and Mr. Clements and Mr. Chabera both participated separately in two additional photographic line-ups.  Both Mr. Clements and Mr. Chabera identified Mr. Lewis and Mr. James as the perpetrators of the crimes against Mr. Perrow.  Because of his injuries, Mr. Perrow was unable to participate in the initial line-ups, but he was shown the second photographic line-up, and he identified Mr. Lewis as the man that he believed shot him and Mr. James as the second perpetrator.

At trial Mr. Perrow, Mr. Clements, and Mr. Chabera all identified Mr. Lewis in court as one of the two people who perpetrated the crimes against Mr. Perrow, and they all testified that they were certain that their identifications were accurate.  Both Mr. Clements and Mr. Chabera recalled that Mr. Lewis had at least one gold tooth, but they did not recall seeing the tattoos that were on Mr. Lewis' arms at the time of the trial.  Finally, Mr. Perrow testified that Mr. Lewis was the person who shot him, and Mr. Clements testified that when Mr. Lewis looked at him at the crime scene, he saw Mr. Lewis put something, which could have been a gun, in his waistband.  Therefore, Mr. Clements had assumed Mr. Lewis was the perpetrator who had fired the gun.

**Crimes Against Mr. Williams**

At approximately 9:30 p.m. on the same day that the crimes against Mr. Perrow were perpetrated, Mr. Williams was the victim of an armed robbery, and he was also shot.  Shortly after Mr. Williams closed the clothing store that he owned, he drove to his home at Villere Street and Elysian Fields Avenue.  He parked his car, set the car alarm, and then saw a man step out of the alleyway next to his residence.  Mr. Williams focused his attention on the man, because there was no reason for him to be in the alleyway.  Mr. Williams observed the man looking up and down the street to determine whether anyone was nearby.  The man then took a gun from his waistband and pulled a bandana that had been around his neck over the lower part of his face.  He then approached Mr. Williams and said, "Bitch, don't move, I got you."  Mr. Williams dropped the keys he was holding and offered to give the man everything in his

possession. In response, the man thrust the gun into Mr. Williams' side and told him to pick up the keys. The man then forced Mr. Williams to walk up the steps to his house. When he reached the landing at the top of the first flight of stairs, Mr. Williams observed a second man on the landing. The second man was armed with a gun, and Mr. Williams saw him pull a bandana over the lower part of his face. The second man then put his gun against Mr. Williams' neck, while the first man still had his gun in Mr. Williams' side. With an armed man on both sides of him, Mr. Williams was forced to open an iron gate in front of the door to his house while one of the robbers said, "Open the mother fucking gate or I'm going to blow your fucking head off. Bitch, open that gate." Mr. Williams opened the gate, and put a key into a lock on his front door. Just as the front door opened, Mr. Lewis shot him and said, "Bitch, I ain't playing."

Mr. Williams testified at trial that while he was being forced into his home at gunpoint, he had been calling his wife, trying to alert her to the situation. When she came to the front door of their house, Mrs. Williams saw her husband bleeding and standing between two men. One of the men, later identified by Mr. Williams as Mr. James, said to her, "Bitch, bring me to the money." He then grabbed her and forced her to go though the house in a search for money while he continually threatened her. When Mrs. Williams was unable to satisfy his demands for money, Mr. James took her into the kitchen where Mr. Williams was already lying on the floor, having been forced into the kitchen by Mr. Lewis who held a gun to Mr. Williams' head. Mr. James ordered Mrs. Williams to get on the floor, also. Mr. Williams then asked the two men not to hurt his wife, and he stood up, went to the kitchen stove, and retrieved some money that was hidden in a vent. Mr. James took the money that had been hidden and ran out of the Williams' house. Mr. Lewis forced Mr. Williams at gunpoint to walk back to his front door, where Mr. Lewis shot Mr. Williams a second time and then fled.

While Mr. Williams was in the hospital recovering from his gunshot wounds, he saw a replay of a news broadcast showing the photographs of two men who had been arrested in connection with the shooting and attempted robbery of a male jogger. Mr. Williams testified at trial that he immediately recognized the perpetrators of the attack on the jogger as the men who had shot and robbed him. Mr. Williams immediately notified the police that the two men who had robbed and shot him were shown on a news broadcast that he had seen. Mr. Williams was subsequently shown two photographic line-ups. He identified Mr. Lewis as the person who had been in the alleyway and who had shot him twice. He identified Mr. James as

the person who had held his wife at gunpoint. At trial, Mr. Williams identified Mr. Lewis in open court as the person who shot him. Mr. Williams testified that he had a very clear view of Mr. Lewis in the alleyway outside of his house, because a high intensity light from a utility pole was illuminating Mr. Lewis' face.

## Medical Testimony

Dr. Ralph Lupin testified at trial as an expert witness in forensic physiology. He testified that he had examined the medical records of both Mr. Perrow and Mr. Williams. Mr. Perrow's medical records showed that he had sustained a number of significant gunshot wounds to the abdomen. One of the bullets perforated Mr. Perrow's intestines and caused a serious infection. Mr. Williams' medical records reflected that a bullet penetrated his liver, causing massive bleeding and severe injury to the organ. Both Mr. Perrow and Mr. Williams required numerous surgical procedures. Dr. Lupin opined that if the extraordinary expertise of the Charity Hospital physicians in responding to trauma had not been available to Mr. Perrow and to Mr. Williams, they would have both died from their wounds.

## The Defense

The defense presented two witnesses, Roshawn Nobles and Mr. James. Ms. Nobles testified that Mr. Lewis was her boyfriend and that they had two children together. She further testified that Mr. Lewis was with her at all times on the day that the crimes were perpetrated against Mr. Perrow and Mr. Williams. She recalled that she and Mr. Lewis were babysitting at her mother's apartment where they were staying a few days. She also testified that Mr. Lewis' grandmother had called at approximately 7:00 a.m. on the day the crimes were committed and that the call had awakened her and Mr. Lewis.

Mr. James testified at trial that his name was, in fact, Lawrence James but that he was booked in connection with the crimes against Mr. Perrow and Mr. Williams under the name Raymond Williams. He testified that he had participated in the crimes against Mr. Perrow and against Mr. and Mrs. Williams. He admitted that he pled guilty to charges in connection with these crimes and stated that Mr. Lewis was not involved in them. He testified that a man known to him only as "Peanut" was the person who shot Mr. Perrow and Mr. Williams. Mr. James did not know Peanut's name or address, and Mr. James was unable to explain why he and Peanut decided to commit the crimes together. He did say,

however, that he and Peanut were both robbers and that "two people that rob people automatically going to bump heads." Mr. James denied that he had ever told the police that Mr. Lewis was involved in the crimes. The State, however, presented a rebuttal witness, New Orleans Police Department Sergeant Charles Watkins, who testified that Mr. James made an oral statement in which he had said that Dimarco Lewis was the person who had shot Mr. Perrow and Mr. Williams.[14]

Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective. Petitioner bears the burden of proof on that claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at

_____

[14] State v. Lewis, 876 So.2d 912, 914-17 (La. App. 4th Cir. 2004) (No. 2003-KA-1234); State Rec., Vol. VI of VII.

689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

If the Court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

Without further discussion of his individual claims, the Louisiana Fourth Circuit Court of Appeal held that petitioner "failed to demonstrate that he is entitled to relief,"[15] and the

---

[15] State v. Lewis, No. 2008-K-0146 (La. App. 4th Cir. Mar. 4, 2008) (unpublished); State Rec., Vol. VII of VII.

Louisiana Supreme Court then denied his related writ application without assigning reasons.[16]

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to those state court decisions denying petitioner's claims unless the decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case.

Petitioner claims that his counsel was ineffective for failing to adequately cross-examine the victims, Jonathan Perrow and Demetrius Williams. However, it is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F.Supp.2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); see also Parker v. Cain, 445 F.Supp.2d 685, 710 (E.D. La. 2006). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense

---

[16] State ex rel. Lewis v. State, 998 So.2d 96 (La. 2009) (No. 2008-KH-0852); State Rec., Vol. VII of VII.

attorneys would not defend a particular client in the same way." Id. For the following reasons, the Court finds that petitioner has not met his burden to prove that counsel was ineffective in his cross-examination of Perrow and Williams.

Jonathan Perrow identified petitioner at trial as the shooter. Perrow noted that there was no doubt in his mind regarding that identification:

> None. No doubt. There's no doubt. I mean, I was – you know, like I said, he was right in my face. He was this close to me and I smelled his breath, you know. And honestly I thought that I was free when he said, "Keep running." I have no idea why he did that. But that is the guy.[17]

Petitioner contends that counsel should have impeached Perrow with his prior testimony from a motion hearing on October 18, 2002. Although the questioning of Perrow was poorly handled at that prior hearing, it appears that Perrow initially indicated that petitioner was not the shooter;[18] however, at that same hearing, he later indicated that petitioner was the shooter.[19] Perrow went on to testify that, because he was running away at the time he was shot, he was not certain which of the two robbers actually shot him.[20]

This Court cannot say that counsel was ineffective in failing to attempt to impeach Perrow based on the prior testimony. As to whether Perrow saw who actually fired the shots, it is clear that defense counsel could have cross-examined Perrow more pointedly on that issue and used

---

[17] State Rec., Vol. V of VII, transcript of February 11, 2003, p. 21.

[18] State Rec., Vol. IV of VII, transcript of October 18, 2002, pp. 34-35.

[19] State Rec., Vol. IV of VII, transcript of October 18, 2002, pp. 68-69.

[20] State Rec., Vol. IV of VII, transcript of October 18, 2002, p. 39.

his prior testimony to impeach him on that point, if necessary.[21]  However, that tactic would have

accomplished little, because, as a principle to the crime, petitioner's culpability would be the same

regardless of whether he or James fired the shots.  See, e.g., State v. Savoy, 931 So.2d 1207, 1213-

14 (La. App. 3rd Cir. 2006); State v. Hill, 742 So.2d 690, 696-97 (La. App. 5th Cir. 1999); State v.

Wills, 740 So.2d 741, 746 (La. App. 2nd Cir. 1999).  As to whether Perrow identified James as the

shooter in the prior testimony, the testimony was confusing and, as noted, seemingly inconsistent.

Because the questioning was handled so poorly at the prior hearing and the responses were unclear,

it is at best questionable whether it could have been used to impeach Perrow effectively at trial.  In

light of these considerations, this Court cannot say that counsel's failure to aggressively challenge

Perrow on these points, at the risk of possibly alienating the jury by appearing to badger the victim,

constituted deficient performance or that prejudice resulted.

Petitioner contends that counsel should likewise have attempted to impeach

Demetrius Williams.  At trial, Williams also positively and unequivocally identified petitioner as

the shooter, noting:

> I'm one hundred percent sure.  I looked at him face-to-face this close
> without any covering on his face.  And from that moment I
> recognized what he was about to do to me.  So he is indelibly locked
> into my mind.  You would never forget that.  I looked at him face-to-
> face clearly in broad – literally in this amount of light face-to-face.[22]

---

[21] The Court notes that such impeachment probably would not have been necessary.  At trial,
Perrow again reiterated that he was running away from the robbers when he was shot.  State Rec.,
Vol. V of VII, transcript of February 11, 2003, p. 23.  If pressed on the point, it seems likely he
would have again conceded that he did not actually see the shots being fired.

[22] State Rec., Vol. V of VII, transcript of February 11, 2003, p. 99.

Petitioner argues that defense counsel should have impeached Williams based on information included in a supplemental police report completed on July 23, 2002, by Detectives Brad Baradell and Michael Riley.[23] In that police report, the detectives wrote that Williams indicated that James, not petitioner, was the shooter.

However, petitioner has not shown that the supplemental police report was even available to defense counsel for use at trial. Under Louisiana law, "although a defendant is generally entitled to the initial police report, he is generally not entitled to any supplemental or follow-up report." State v. Williams, 839 So.2d 348, 353 (La. App. 5th Cir. 2003); see also State v. Silva, 699 So.2d 487, 490 (La. App. 4th Cir. 1997) ("As to the defendant's particular complaint that the State should have turned over the supplemental police report, the State is decidedly not required to do so."). Without a showing that the supplemental police report was in fact available to defense counsel, it cannot be said that he performed deficiently in failing to impeach Williams based on that report. However, even if the supplemental report was available, there is no question that Williams positively identified petitioner as one of the robbers and, again, petitioner's culpability is the same regardless of who fired the shots. Accordingly, he has not demonstrated that the result of the proceeding would have been different if only defense counsel had more aggressively cross-examined Williams on this point.

Petitioner next claims that his counsel was ineffective in failing to notify the state that petitioner's grandmother would testify as an alibi witness. At trial, petitioner's girlfriend, Roshawn Nobles, testified that petitioner was awaken by a telephone call from his grandmother at

---

[23] A copy of that police report in Volume I of the state court record.

approximately 7:00 a.m. on the day of the crimes. After that testimony, defense counsel decided that perhaps he should call the grandmother to the stand to verify that she placed such a call. The trial judge ruled that the grandmother would not be permitted to testify because she had not previously been listed as a witness. On that issue, the transcript reflects the following exchange:

> BY MR. BURGLASS [defense counsel]:
> We did have a sidebar regarding my calling the grandmother since she came up as the person who called on the day of the crime. I did not include her as an alibi but then again the call was at seven in the morning. So I don't – I don't feel that she really is a necessary witness except that she was mentioned in the – in the testimony and it would maybe have corroborated.

> BY THE COURT:
> You – you would be calling this witness to establish that your client was somewhere else other than at the scene of the crime, eh [sic] was with his girlfriend, therefore could –

> BY MR. BURGLASS:
> Well, except that –

> BY THE COURT:
> Wait, wait, wait. Therefore could not have committed the crimes contained in counts one and count two. That would be your purpose of calling that witness, correct?

> BY MR. BURGLASS:
> No, just to corroborate that she made the phone call, period.

> BY THE COURT:
> Well, that – but that was part of an alibi –

> BY MR. BURGLASS:
> Because the time of the call was at 7:00 in the morning.

> BY THE COURT:
> Isn't that when the first crime allegedly occurred?

BY MR. BURGLASS:
      No, hours later.

BY THE COURT:
      I disagree. Count one and count two, which was the attempt armed robber [sic] and attempt murder of Mr. Perrow, according to the testimony I've heard was around 7:00 or 7:15 –

BY MR. BURGLASS:
      Well –

[BY THE COURT:]
      Wait, let me finish. 7:00 or 7:15 in the morning. Counts three and counts four against Mr. Williams occurred about 10:00 that night. That's the time frame that I think the alibi was supposed to be covering and if the grandmother's going to say that she spoke to him at the girlfriend's house at 7:00 or 7:30 in the morning, I think it does establish an alibi.

BY MR. BURGLASS:
      I thought – I thought the crime had occurred hours later. In that case I think her testimony is vital and certainly was an oversight in not forewarning the State.

BY THE COURT:
      But – right. But I think by allowing – if we were to allow you to call this witness it would deprive them of the opportunity to be able to get evidence to rebut her testimony such as phone records, both of the girlfriend as well as the grandmother. So I feel in a sense that the State was not notified prior to you wishing to call this witness, and I will not allow you to call the witness. And I'll note your objection for the record.[24]

This Court is given pause by defense counsel's seeming unfamiliarity with even the

most basic facts of his case. Had he realized that the crimes against Mr. Perrow occurred at the same

---

[24] State Rec., Vol. VI of VII, transcript of February 13, 2003, pp. 33-35.

time as the alleged telephone call, he presumably would have taken the necessary steps to notify the prosecutor that the grandmother would testify at trial.

Nevertheless, even if the Court assumes that counsel performed deficiently in that respect, petitioner has not demonstrated that he was prejudiced for several reasons. First, petitioner has provided no evidence whatsoever, such as an affidavit from the grandmother, showing that she would in fact have testified that she made such a telephone call at 7:00 a.m. on the date of the crimes. See Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (to show that prejudice resulted from a witness not testifying, a petitioner must bring forth evidence, such as affidavits from the uncalled witness, showing that the testimony would have been favorable and that the witness would have testified at trial); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance."); Daigle v. Travis, Civ. Action No. 07-9425, 2008 WL 3562458, at *10 (E.D. La. Aug. 12, 2008). Second, the grandmother's testimony would have been merely cumulative, in that Roshawn Nobles had already testified regarding the alleged call. The failure to present cumulative testimony does not constitute ineffective assistance. See, e.g., Coble v. Quarterman, 496 F.3d 430, 436 (5th Cir. 2007). Third, the grandmother's testimony would have been of limited value because her close familial relationship to the petitioner would have made her testimony inherently suspect.

See Talley v. Cain, Civ. Action No. 08-3542, 2009 WL 916331, at *11 (E.D. La. Apr. 6, 2009) (noting that alibi testimony from the petitioner's mother would have been "inherently suspect"); United States ex rel. Emerson v. Gramley, 902 F.Supp. 143, 147 (N. D. Ill. 1995) (noting that petitioner's mother was an "interested witness" and, therefore, "would not have provided persuasive evidence of an alibi"), aff'd, 91 F.3d 898 (7th Cir. 1996). In light of those considerations and the overwhelming evidence of petitioner's guilt, the Court has no basis for finding that there is a reasonable probability that the result of the proceeding would have been different if only defense counsel had taken the necessary steps to have the grandmother testify. Accordingly, this claim should be rejected.[25]

It is also argued that defense counsel was ineffective for refusing to allow petitioner to testify at trial. "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987). However, petitioner has offered no evidence to show that counsel prevented him from testifying. On the contrary, the record reflects that petitioner, upon the advice of counsel, decided of his own accord not to take the stand. The transcript reflects the following exchange:

> THE COURT:
> The State had called one witness in rebuttal, Sergeant Watkins. We did have a sidebar in which Mr. Burglass indicated that he wished to have a brief conference with his client to discuss even

---

[25] In his discussion of this claim, petitioner also contends that his counsel was ineffective in failing to obtain and introduce telephone records showing that such a call was made. Even if this is considered a separate claim, it likewise fails because petitioner has presented no evidence whatsoever to show that the telephone records would in fact corroborate Roshawn Nobles' testimony. Without such evidence, he cannot meet his burden of proof to demonstrate that he was prejudiced by counsel's failure to obtain and introduce those records.

though the State has started it's [sic] rebuttal whether or not he would wish to call his client in the Defense part of the case. Now, I said if I did do that I would allow the State to then call witnesses in rebuttal to his testimony.

Have you had an opportunity to discuss with your client whether or not he wishes to take the stand?

BY MR. BURGLASS:

Your Honor, I discussed with my client the possibility of his taking the stand. He indicated that he had some desire to do that. And after further discussion he has decided not to do that. It's not because he's frightened to do it, it's just that what he could if he did. He'd say I didn't do it, he's already done that, and then next I was with my girlfriend and she's already done that. After that he'd be open to cross-examination, which would be totally unnecessary. In other words, I don't think he could further his case.

BY THE COURT:

So you do not wish to call him to the stand?

BY MR. BURGLASS:

He will not testify and he understands that.[26]

Petitioner offers no proof to contradict the representation that he was in agreement with the decision not to testify. Moreover, he does not allege and the record does not suggest that he ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so. Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue. See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003). Nevertheless, the Court cannot ignore the fact that petitioner has never presented *any* evidence, either to the state courts or to this Court, to corroborate his allegations.

---

[26] State Rec., Vol. VI of VII, transcript of February 13, 2003, pp. 32-33.

Without more, petitioner's bare allegations are insufficient to trigger either the granting of relief or further fact-finding by this Court.  As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable.  It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen.  Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him.  It just is too facile a tactic to be allowed to succeed.   Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No, 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005).  This Court finds that, in light of the complete lack of evidentiary support for petitioner's underlying factual contention, he has failed to meet his burden to establish that he is entitled to relief.

To the extent that petitioner is alleging that his counsel was ineffective in failing to call him testify, the Court likewise rejects that claim.  A decision whether to put a criminal defendant

on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); see also United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008). Further, such a matter is inherently one of trial strategy, and, as previously noted, federal *habeas* courts are not to lightly second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

The instant *habeas* proceeding is far removed from the context of the actual trial, and this Court has no mechanism available to fairly judge counsel's assessment of his own client at the time and his view of the strength of the prosecution's case as it was presented live. Under these circumstances and in light of the foregoing law regarding the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess counsel's decision not to put petitioner on the stand. This Court simply cannot find that counsel performed deficiently by failing to have petitioner testify at trial. Accordingly, this claim should be rejected.[27]

---

[27] The Court notes that petitioner contends that his counsel's decision was based on an incorrect belief that the state could impeach petitioner on cross-examination by questioning him concerning a prior juvenile adjudication for simple robbery. See La. Code Evid. art. 609.1(F) ("Evidence of juvenile adjudications of delinquency is generally not admissible under this Article, except for use in proceedings brought pursuant to the habitual offender law, R.S. 15:529.1."). However, petitioner has presented no evidence whatsoever in support of his bald allegation that counsel's decision was based on such a belief. Further, as previously noted, defense counsel stated on the record that his decision was based on the fact that petitioner's testimony would bring forth no new information and counsel's belief that "I don't think he could further his case." State Rec., Vol. VI of VII, transcript of February 13, 2003, p. 32.

Lastly, petitioner claims that his counsel was ineffective for failing to object to when the prosecutor compared petitioner to a shark-like predator. During his closing argument, the prosecutor stated:

> About two months ago I was in Gulf Shores and I was on the beach. And I saw an ambulance down the beach. I figured maybe somebody had a heart attack or something. So I went down there to see what that ambulance was there for. It had left. I found out that a man was swimming in that surf who was attacked by a shark. The man lost his arm. The same surf that I swim in four or five times a years for my entire life. That man was swimming in the surf and he was attacked by a predator. A predator that didn't care about him. Didn't care about the pain that he felt. Didn't care about his life. All that predator wanted to do was kill him.
>
> This case has a lot of similarities to that with one tremendous different [sic]. A shark can't think. A shark doesn't know right from wrong. A shark does not know good from evil. A shark is simply a fish. He's man. He knows good from evil. He knows right from wrong. And what he did to Mr. Perrow was the same thing that shark did to that man swimming in the surf.
>
> Mr. Perrow was jogging in the morning. Mr. Perrow was doing something he loved to do. Mr. Perrow was doing something that hundreds of people in this city do. That swimmer was the wrong man at the wrong place at the wrong time. And that's why he was attacked by that shark. Mr. Perrow was the wrong man, at the wrong time, and the wrong place when Mr. Perrow came across somebody more vicious than that shark. He came across him.[28]

It is clear that "[a] decision not to object to a closing argument is a matter of trial strategy," and, as such, is accorded great deference. Drew v. Collins, 964 F.2d 411, 423 (5th Cir. 1992); see also Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993); Spicer v. Cain, Civ. Action No. 07-3770, 2007 WL 4532221, at *10 (E.D. La. Dec. 19, 2007); Rios-Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D. Tex. 2000) ("Generally speaking, a failure to object, standing alone,

---

[28] State Rec., Vol. VI of VII, transcript of February 13, 2003, pp. 51-52

does not rise to the level of constitutionally deficient performance. In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy.").

Even if this Court assumes that the prosecutor's arguments were improper and that an objection to them would have been sustained, defense counsel was still allowed to make a strategic choice to forego such objections to avoid antagonizing the jury. See Wiley v. Puckett, 969 F.2d 86, 102 (5th Cir. 1992); see also Spicer, 2007 WL 4532221, at *10. Further, the proposed objection would have invited the jurors to focus their attention on the prosecutor's closing argument, perhaps thereby inflating its importance in the jurors' minds. Counsel can hardly be deemed to have performed ineffectively in choosing to avoid that unnecessary risk.

Additionally, even if counsel's choices regarding the objections *could* be considered deficient performance, petitioner clearly has not shown the prejudice required to support his claim. First, the jurors were properly instructed that they were not to consider the prosecutor's arguments as evidence,[29] and "[j]urors are presumed to follow their instructions ...." Woods v. Johnson, 75 F.3d

---

[29] The trial judge properly instructed the jury on that they were to decide the case based solely on the evidence:

> Now, you must determine whether or not a fact has been proven only from the evidence presented or from a lack of evidence. The evidence which you should consider consists of the testimony of witnesses, and of exhibits such as writings and physical objects the Court has permitted the parties to introduce. You must consider only evidence, which was admitted during the trial.

State Rec., Vol. VI of VII, transcript of February 13, 2003, p. 65. The trial court further correctly instructed the jury that the attorneys's statements were not evidence:

1017, 1036 n.29 (5th Cir. 1996). Second, in any event, the evidence against petitioner was overwhelming. Petitioner simply has not shown that there is a reasonable probability that the result of the proceeding would have been different if only counsel had made the proposed objection to the prosecutor's unflattering comparison in his closing argument.

In summary, petitioner has not demonstrated that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects those claims.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Dimarco Lewis** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

---

> Statements made by the attorneys at any time during the trial are not evidence. In the opening statements the attorneys were permitted to tell you the facts they expected to prove. In closing arguments the attorneys were permitted to present for your consideration their contentions regarding what the evidence has shown or not shown, and what conclusions they think may be drawn from the evidence. The opening statements and the closing arguments are not to be considered as evidence.

State Rec., Vol. VI of VII, transcript of February 13, 2003, pp. 66-67.

court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-fourth day of September, 2009.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE